Markle et al., Appellants, v. Grothe.

Argued March 11, 1931.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham, Baldrige and Drew, JJ.

*Charles A. May,* and with him *McClean Stock,* for appellants.—The right of the upper land owner to discharge water on the lower lands of his neighbor is in general a right of flowage only in the natural ways and natural quantities: Miller v. Laubach, 47 Pa. 154; Pfeiffer v. Brown et al., 165 Pa. 267.

*George Hay Kain,* for appellee, cited: Strauss v. Allentown, 215 Pa. 96; Rielly v. Stephenson, 222 Pa. 252; Kuczineski v. Scranton Coal Co., 99 Pa. Superior Ct. 20.

OPINION BY BALDRIGE, J., April 15, 1931:

George E. Neff, one of the plaintiffs, in 1922, acquired title to a tract of land, adjoining the city of York, which he sub-divided into lots and graded streets and alleys. The plaintiffs, Markle, Koch, Billmyer and Hess, are the owners of four adjoining lots of ground, which are part of this land development, and upon which have been erected dwelling houses.

The defendant bought, in 1912, a tract of land of 31 acres, previously used for agricultural purposes, which lies to the south of the appellants' land and on a higher level. The surface drainage from the defendant's land flows in a well defined natural channel, in a northerly direction, toward the Neff tract. When it reaches Boundary Avenue, it runs thereunder through an 8-inch pipe constructed by the township supervisors; then crosses an intervening tract, a distance of 140 feet, to what is now an alley in the Neff plot of lots; thence this natural watercourse takes a west-

erly direction for a very considerable distance. In 1922 Neff diverted the course of the water, after it flowed 410 feet in this last mentioned direction, and turned it to the right in a general northeast course, so that the water flows down an alley which he laid out at a grade given to him by the city planning commission, and later, in 1927, he regraded this alley. The rear of the other plaintiffs' lots abuts thereon.

The defendant constructed a brick plant on his property shortly after he purchased it and to get clay for the bricks, made excavations at six various locations. In these holes surface water collects from the defendant's tract of land and from other lands lying to the south, within the same drainage area, which consist of about 265 acres. Four of these holes lie in the eastern section of the defendant's land where underground springs were uncovered, and the waters therefrom, as well as surface water, collect therein. The defendant, by drain pipes laid about 2 feet under ground, conducts this water into a sump, and thence by another system of underground pipes, 3½ inches in diameter, conveys it to the south gutter of Boundary Avenue, where it enters the abovementioned 8-inch pipe. In the two holes in the western end of the defendant's land, no underground sources of water were found, so that their contents consist entirely of surface drainage water. When the water in these two holes reaches a certain height, it percolates into a pit in which revolves a flywheel of an engine used by defendant in his brick plant, and prevents its operation. In order to relieve this condition, the defendant on three different occasions—1927, 1928 and 1929—pumped water from the larger one of the two holes onto the surface of his land; then the water flowed to the gutter on the south side of Boundary Avenue, and through the 8-inch pipe to the natural watercourse.

The plaintiffs filed this bill complaining of the de-

fendant's collecting water in these excavations from underground springs, watercourses and surface water, and disposing of it as above described, rendering their land muddy, soggy, and useless for cultivation, and their homes unfit for domestic use as the water seeps into their cellars.

We have, therefore, for our consideration, the right of the defendant, the upper land owner, to discharge water onto the lands of the lower owners, the plaintiffs. Mr. Justice MITCHELL, in Collins v. Chartiers V. Gas Co., 131 Pa. 143, 156, in discussing the control and flow of water, very aptly said, "The dividing line between the right to use one's own, and the duty not to injure another's, is one of great nicety and importance, and frequently of difficulty." In dealing with the respective rights of dominant and servient landowners, it is well to bear in mind the statement in Kauffman v. Griesemer, 26 Pa. 407, 413: "Almost the whole law of watercourses is founded on the maxim of the common law, aqua currit et debet currere. Because water is descendible by nature, the owner of a dominant or superior heritage has an easement in the servient or inferior tenement for the discharge of all waters which by nature rise in or flow or fall upon the superior." This fundamental principle applies to springs, as well as surface water, and, generally speaking, gives the owner the right to the natural, proper and profitable use of his own land. If, in the exercise of this right without negligence, unavoidable loss is sustained by a lower owner it is damnum absque injuria: Strauss v. Allentown, 215 Pa. 96, 98. The dominant owner may even increase the flow of water by cultivating his land or developing it for natural and reasonable uses without liability for damage to the servient owner (Miller v. Laubach, 47 Pa. 154), but he cannot concentrate the water, and by artificial means increase its flow or turn it by unnatural channels

where it is not wont to flow: Pfeiffer v. Brown, 165 Pa. 267; Meixell v. Morgan, 149 Pa. 415; Toole v. D. L. & W. R. R., 27 Pa. Superior Ct. 577; Gould on Waters, 3d Ed., Sec. 265. We do not consider, however, that the accumulation of surface water in the excavations, as alleged in the case at bar, changed its character so as to prevent it from being legally returned, provided it was unincreased in volume, into its natural course in which it would have flowed before its interruption; that was a reasonable control within the defendant's rights: McCormick v. Horan, 81 N. Y. 86, 37 Am. Rep. 479; Farnham on Waters and Water Rights, Vol. 3, p. 2627. What is a natural and reasonable use depends upon the facts in each case and is, ordinarily, for the determination of the chancellor, or the jury, as the case may be: Davidson v. Sanders, 1 Pa. Superior Ct. 432.

Bearing in mind these guiding principles, we turn to the chancellor's findings of fact, that the land in the general area involved descends in a northerly direction and that the natural outlet of the drainage water was down to, and on, the plaintiffs' property; that the plaintiffs' houses are built on the lowest portion of that territory and that the land in that immediate neighborhood, being naturally low, was, prior to the erection of these houses, under normal conditions, swampy and at times even covered with water; that during the construction of the plaintiffs' houses the water had accumulated in the cellars. The chancellor found further that the action of the defendant did not result in turning into the culvert crossing Boundary Avenue any more water than would have naturally drained from the defendant's land if it had remained in its natural state, but that "sometimes during heavy rains, and particularly during a long period of rainfall in the course of which there are some heavy downpours, the water flowing from the

drainage area of defendant's land, augmented by water from another drainage area which flows over into Boundary Avenue, saturates the rear end of the lots of the plaintiffs and causes water to accumulate in the cellars of the plaintiffs' dwellings.'' In effect, the chancellor's finding was, that the action of the defendant was not the cause of the plaintiffs' damage as there was no increased burden placed upon the inferior landowners; that the damage sustained by the plaintiffs was due to natural conditions. From the opinion of the chancellor, we learn that it was conceded at the trial that the defendant was within his legal rights insofar as the drainage of the surface water was concerned, but it was contended that insofar as the water had accumulated from springs in the eastern end of the defendant's lands that the defendant was exceeding his rights in causing that water to flow into the natural channel. The chancellor found, however, that whatever damage may have been sustained was from the water pumped by the defendant from the large excavation on the western end of his property which contained only the drainage or surface water. We must give the findings of fact of the chancellor, which involve the credibility of witnesses and the weight to be given their testimony, the same effect of a verdict of a jury in an action of trespass, and nothing but clear error would warrant our setting aside these findings: Cruzan v. Cruzan, 243 Pa. 165. It inevitably follows, as the chancellor determined that the volume of water which caused the alleged damage was not increased by defendant's action, and that there was no change in the course of the water which, under natural conditions, flowed upon the plaintiffs' land, the defendant was not liable for the injury sustained.

Order of the learned court below is affirmed.