**Brady Brothers Company v.
Board of Supervisors of Whitpain Township**

*John P. Knox,* for appellant.

*Charles Kerlavage,* for appellee.

TREDINNICK, J., November 11, 1971.—Whitpain Township (township) refused to approve a subdivision plan submitted to it by Brady Brothers Company (Brady), a decision which the latter contests by this appeal, taken under section 512 of the Municipalities Planning Code of July 31, 1968 (no. 247), 53 PS §10512.

Plaintiff sought to subdivide a seven-acre tract into seven residential building lots. The tract is situate on the west side of Stenton Avenue between Blue Bell Road and Walton Road. Opposite the northernmost frontage of the tract, Granary Road, a township road, enters the east side of Stenton. On the southeast corner of the "T" intersection framed by Granary Road and Stenton Avenue, there is situate the residence of James Feeley. A stream which roughly parallels Stenton Avenue on the east side runs in a southerly direction under Granary Road via a conduit, near Stenton Avenue, and thence through the Feeley property.

The subdivision plan filed by Brady proposed the installation of an underground storm drainage pipe from a low point in a proposed street in the development, across Stenton Avenue, and along the southerly side of the cartway of Granary Road (but within its right-of-way) to the conduit carrying the aforementioned stream under Granary Road. At that latter point the storm drain would empty into the stream.

The township rejected the plan according to its letter of June 8, 1971, because its acceptance of the proposed storm sewer would "place the township in legal jeopardy and possibly incur a financial penalty to the supervisors themselves." More pithily stated, the township feared its approval would render it liable to litigation by Feeley, inasmuch as the plan, in the

township's judgment, provides for the artificial collection and concentration of surface water and its improper discharge upon the Feeley property.

While the supervisors are enjoined by section 508(2) of the Planning Code, 53 PS § 10508(2), to "specify the defects found in the (subdivision) application and describe the requirements which have not been met and shall, in each case, cite to the provisions of the statute or ordinance relied upon," we doubt it can seriously be disputed that a township has the right to refuse approval of a subdivision where that approval will, in effect, authorize a trespass upon another. Cf. Clinton v. West Norriton Township, 75 Montg. L.R. 262 (1959). And this is so regardless of whether the township may be sued. (To the effect that they may be, see Rose et al. v. Lindy Brothers Builders, Inc., et al., 81 Montg. L.R. 46 (1962)). Thus, if, in fact, the proposed disposition of storm water violates the rights of another, the township should properly not lend its aid to the plan. We must, therefore, explore the law of surface waters; then examine the facts in the present case in the light of that law.

In the Rau v. Wilden Acres, Inc. 376 Pa. 493 (1954), case, at page 494, it is stated:

"A landowner may not alter the natural flow of surface water on his property by concentrating it in an artificial channel and discharging it upon the lower land of his neighbor even though no more water is thereby collected than would have naturally flowed upon the neighbor's land in a diffused condition. One may make improvements upon his own land, especially in the development of urban property, grade it and build upon it, without liability for an incidental effect upon adjoining property even though there may result some additional flow of surface water thereon through a natural watercourse, but he may not, by artificial

means, gather the water into a body and precipitate it upon his neighbor's property. Even a municipality, while not liable to a property owner for an increased flow of surface water over his land arising merely from changes in the character of the surface produced by the opening of streets and the building of houses in the ordinary and regular course of the expansion of the city, may not divert the water onto another's land through the medium of artificial channels."

In Chamberlin v. Ciaffoni, 373 Pa. 430, 435, 437 (1953), former Chief Justice Stern stated:

". . . in the development of urban property [an owner of higher land may] improve his land by regrading it or erecting buildings thereon, without legal responsibility for any consequent diversion of surface waters . . . to that of adjoining owners . . . It is only where the owner of the higher land is guilty of negligence which causes unnecessary damage to the servient owner, *or where, by an artificial channel, he collects and discharges surface waters in a body or precipitates them in greatly increased quantities upon his neighbor, that the latter may recover for any damage thereby inflicted.*" (Italics supplied.)

It will be noted that the prohibition against the use of artificial channels appears to be absolute, whereas, in the absence of use of such artificial channels, the diversion need only be done in a careful, prudent, non-negligent manner.

In the present case, the evidence established that the normal flow of surface water from the Brady tract was, diffusely, to the stream traversing the Feeley property. That natural course of events was altered when Stenton Avenue was curbed, so that presently, surface water drains off the Brady property onto Stenton Avenue and is there trapped, so that it flows southwardly on Stenton Avenue. There is no evidence that

the proposed storm drain is to be installed below any natural swale area which collected surface run off and naturally delivered surface water to the point of proposed discharge. There is some authority to the effect that were that the case, the prohibition against artificial conduits may be relaxed, undoubtedly on the theory that one may accomplish artificially that which had been similarly accomplished by nature. Cf. Sunnybrook Golf Club v. Lucan Corp., et al., 72 Montg. L. R. 430 (1956).

We must, therefore, conclude that in collecting water in the proposed street pattern, channeling it to the low point, and there conveying it by underground conduit to a point a few feet from the Feeley property, Brady will "by artificial means, gather the water into a body and precipitate it upon his neighbor's property." The fact that the water is technically discharged into the stream at a point within the right-of-way of Granary Lane is not important. As noted, that point is but a few feet upstream from the Feeley property. In litigation between the dominant and servient tenement owners, the question has never been whether the water was precipitated directly upon the servient tenement, but whether, wherever discharged, its necessary effect was to damage the servient tenement: Clinton v. West Norriton Township, supra; (Allen v. Woodhaven Construction Co., 75 Montg. L.R. 120, 126, ". . . water is channeled into storm sewer inlets and emerges approximately 40-50 feet from Plaintiffs' property out of a 24-inch drain pipe." Dominant tenement liable.)

We have not yet discussed the question of whether this concentration of water will, in fact, damage Feeley. After all, any cause of action by Feeley must be supported by evidence of damage. To state it another way, even if the proposed method of disposal of surface

water violates the foregoing law, it is not actionable unless it produces damage.

The state of the record in this regard leaves something to be desired. However, there was testimony that the stream is presently burdened beyond its capacity during peak storms. That is undoubtedly so. Obviously, the Brady proposal will aggravate that condition.

Under these circumstances, we cannot say that the Supervisors of Whitpain Township were wrong in refusing approval. They operate under a broad mandate "to minimize such problems as may presently exist or which may be foreseen," as stated in section 105, the purpose clause, of the Pennsylvania Municipalities Planning Code, 53 PS §10105.

Accordingly, we enter the following

### ORDER

And now, November 11, 1971, the appeal is dismissed.